IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| In re SCOTT C. ENKE, a Juror in a | ) | |
| Criminal Trial, | ) | No. 12 MC 130 |
| | ) | |
| Respondent. | ) | |

CORRECTED MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

The law governing this proceeding is 28 U.S.C. § 1866(g), which states:

Any person summoned for jury service who fails to appear as directed may be ordered by the district court to appear forthwith and show cause for failure to comply with the summons. Any person who fails to show good cause for noncompliance with a summons may be fined not more than $1,000, imprisoned not more than three days, ordered to perform community service, or any combination thereof.

Scott Enke was summoned to appear for a two-week term of jury service beginning on Monday February 27, 2012. (Ct. Ex. 1.) He was selected by the parties on March 1 and swore under oath to "well and truly try the matters in issue now on trial, and render a true verdict" in the criminal trial of *United States v. Chhibber*, 11 CR 119, before District Judge Suzanne B. Conlon. Mr. Enke served as the trial proceeded on March 1, 2, 5, 6 and 7, but did not appear for jury service on March 8, even though the trial had not finished and Judge Conlon had ordered the jury to return on March 8, 2012.

The matter was referred to this court, which ordered Mr. Enke, a representative of his employer Covidien PLC, and Enke's supervisor, Bob Bushok, to attend a show cause hearing. (Dkt. No. 1.) The show cause hearing was held on April 20, 2012. (Dkt. No. 12.) For the reasons explained below, the court finds that Enke has failed to establish good cause for his intentional absence from his jury service on March 8, 2012.

BACKGROUND

According to the testimony at the show cause hearing, Enke works as a neurovascular clinical sales representative for Covidien PLC, a medical device supplier that operates throughout the United States. In that role, Enke travels around the Midwest selling medical devices to hospitals and supporting doctors in the use of Covidien's products. Often, Enke's job requires his presence in the operating room to assist the treating physician. The pay received by Covidien's sales representatives, including Enke, depends on the extent to which their clients use Covidien's products, but they do not necessarily need to attend a procedure to receive credit. Instead, sales representatives routinely ask other Covidien employees to cover for them if they cannot attend a scheduled procedure for one of their clients.

In January of 2012, Enke was scheduled to travel to Iowa City, Iowa, to support a doctor at the University of Iowa Hospitals and Clinics in the use of one of Covidien's products. The University of Iowa Hospitals and Clinics is Enke's biggest client. The doctor, Dr. David Hasan, was scheduled to perform several procedures each using a particular Covidien product that had only recently received approval from the FDA. To meet FDA regulations for the use of the product, Covidien planned to supply a "proctoring physician" to assist Dr. Hasan. Just prior to the first procedure, however, Covidien's proctoring physician cancelled, and the procedures were rescheduled for March 8 and 9, 2012.

Several weeks later, the hospital held a meeting attended by Enke and his supervisor, Bob Bushok, which Bushok described as "a show cause hearing" with the hospital. At the meeting, the hospital and Dr. Hasan demanded an explanation for the failure of Covidien's proctoring physician to attend the January 2012 scheduled procedures. The hospital then expressed its dissatisfaction with Covidien and stated that if the March 2012 rescheduled procedures did not go forward as planned,

Covidien, and Enke, could lose the account. Enke felt that the hospital's threat meant that if he was not present at the rescheduled procedure, he and Covidien would lose the University of Iowa Hospitals and Clinics account.

When Enke received the jury summons in early February, he was aware that the rescheduled procedures in Iowa were to take place on March 8 and 9. He did not, however, ask to be excused from his jury service obligations or inform anyone associated with the court of his potential scheduling conflict. Also, he did not ask Bushok to assist him in finding a replacement to cover the procedures. After being selected to serve on the *Chhibber* criminal trial jury on March 1, Enke asked for and received leave from his work at Covidien to serve as a juror. He did not, however, do anything to avert the potential conflict between his jury service and the March 8 trip to Iowa. Enke testified at the show cause hearing that because of his conversations with his fellow jurors and a form he received from the court, he believed that the trial to which he was assigned would last only three to five days. Enke did not produce the "form" he said he received. In fact, no such form exists. The transcript of the trial reflects that Judge Conlon told the jury on March 1 that the trial was "expected to take approximately one week." (Covidien Ex. E, at 5.)

On Thursday, March 1, Enke reported in an e-mail to Bushok that he had been selected to serve on a jury. Enke also testified at the show cause hearing that he spoke to Bushok on the evening of Friday, March 2, told him that the trial would continue into the next week, and brought up his scheduled trip to Iowa. According to Enke, Bushok commented that the trip to Iowa would be an "interesting situation," which Enke understood to mean that the University of Iowa hospital would not like it if Enke did not attend the scheduled procedures. Enke then told Bushok that the procedures in Iowa would not go well if he was not there. Enke still did not ask for a substitute to

cover for him on the Iowa trip, nor did Bushok offer to assist him in finding one. Bushok testified that he did not remember this conversation, although he recalled discussing the Iowa case in general with Enke many times during Enke's jury service, and he stated that he was under the assumption from Enke that the trial would be over before March 8.

On the evening of March 7, the day before Enke intentionally failed to appear for his jury service, Enke telephoned Alberta Rone, Judge Conlon's courtroom deputy clerk. He explained to her that he had to travel to Iowa for work the next day and that there was no one to take his place. He then stated that he did not know if he would be able to appear for his jury service in the trial the next day. At that point, Enke's account of the conversation diverges from that of Rone. According to Enke, Rone told him that he was excused from jury service. Rone reported, however, that she told Enke that she did not have authority to excuse him but that she would tell Judge Conlon. Rone stated that Enke then repeatedly asked to speak with Judge Conlon. Rone told Enke that Judge Conlon had left for the day and that she would report his message to Judge Conlon. Enke then insisted on speaking to someone else. After that, Rone transferred Enke to Judge Conlon's voice mail. Enke left the message that he could not be in court the next day. Then, Enke called Bushok and informed him that he was excused.

The next morning at about 8 a.m., Rone, after talking with Judge Conlon, called Enke and told him that Judge Conlon had said that he needed to report for jury duty, and that he had not been excused. At that point, however, Enke was several hours away from Chicago on his way to Iowa. He responded to Rone that he had understood that he was excused and that he could not make it back to Chicago in time for the trial at 9 a.m. Rone reported that Enke was "agitated" during the conversation. Enke then gave Rone Bushok's contact information and told her that Bushok would

explain his absence. Rone spoke to Bushok, who confirmed that he knew Enke was on jury duty but stated that Covidien now needed him to go to Iowa.

Because Enke had not heard back from the court, he called Judge Conlon's judicial assistant shortly after 9 a.m. to check on his status. He was told that he need not do anything, and that Chief Judge Holderman would be contacting him. Enke then continued on his business trip to Iowa to assist with the scheduled procedures. Enke made $1,600 for his work in Iowa.

## LEGAL ANALYSIS

I.     Importance of the Jury and the Participation of Every Eligible Citizen

It is plain that Enke acted under the assumption that fulfilling his obligation to serve on a jury was not as important as his business trip for his employer. Sadly, that assumption is all too widespread among both potential jurors and their employers, presenting a significant challenge to the ongoing effectiveness of the jury as an institution. The National Center for State Courts has estimated that, on average, 9% of potential jurors fail to appear in response to jury summonses, although absenteeism in some jurisdictions is much higher.[1] In an extreme case, the clerk of Harris County, Texas, the third largest county in the nation, recently reported that "only 20 percent of those summoned for jury service actually respond or report to serve."[2] One 2008 nationwide poll reported that 32 percent of respondents had ignored a summons for jury duty at some point in their life.[3] Those statistics reflect a lamentably dismissive public attitude toward jury service. As one appellate

---

[1] Paula Hannaford-Agor, *Jury News: Tales of "Tales" Juries*, Ct. Manager, Summer 2008, at 27, 28.

[2] Jennifer Walker Elrod, *Is the Jury Still Out?: A Case for the Continued Viability of the American Jury*, 44 Tex. Tech L. Rev. 303, 327 (2012) (citation omitted).

[3] John H. Langbein et al., *History of the Common Law: The Development of Anglo-American Legal Institutions* 539 (2009).

judge with extensive trial experience reported:

> Unfortunately, jurors often begin their service biased against the experience. Lawyers are often the first to tell people "how to get out of jury duty." Indeed, lawyers cavalierly talk about biased judges and stupid juries, contributing to the distrust that ordinary citizens have for their legal system. In addition, I have overheard judicial law clerks, who work in the courts every day, saying that they "don't want to bother people" by calling them for jury duty.[4]

This attitude needs to change, both among attorneys and the public, or the jury system will not continue as a viable institution of fairness and justice. Merely enforcing 28 U.S.C. § 1866(g) and mandating jury service on an individual by individual basis is not sufficient; instead, courts must attempt to educate the public and the legal profession about the importance of the jury and the duty of every citizen to uphold it.

Much has been said, of course, of the role the jury plays as "the very palladium of free government"[5] and "the principal bulwark of our liberties,"[6] or about the jury's ancient origins in the democratic government of Athens[7] and its enshrinement in Magna Carta,[8] that great font of Western liberty. Much also has been said about "the blood and treasure it has cost to get and keep this

---

[4] Elrod, *supra* note 2, at 327.

[5] *The Federalist No. 83*, at 499 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The sentiment was, of course, that of the Anti-Federalists, although the Federalists agreed that the jury was "a valuable safeguard to liberty." *Id.*; *see also* Stephan Landsman & James F. Holderman, *The Evolution of the Jury Trial in America*, Litigation, Fall 2010, at 32, 34.

[6] 3 William Blackstone, *Commentaries* *350.

[7] *See In re Tiffany Green*, No. 96-0222, 1996 WL 660949, at *2 (E.D. Pa. Nov. 15, 1996).

[8] *Magna Carta* art. 39 (Eng. 1215) (Richard L. Bates trans. 1993) ("No free man shall be taken, imprisoned, deprived of possessions, outlawed, exiled or in any way diminished, nor shall we go against him or send anyone against him except by means of a legal judgment of his peers or by means of a law of the land.").

birthright of every American,"[9] and about the role the jury played in the resistance against English oppression and as a spark for the American Revolution.[10]

Perhaps it has been too little emphasized, however, that every potential juror is crucial to the ability of the jury as an institution to perform its function successfully. A juror in Enke's position might think that the business of justice can proceed without him, that other citizens can carry out his jury responsibilities just as well as he, that his own business interests are more vital than his jury service, and that he is therefore justified in pursuing his own good rather than contributing to the common weal.

But the exceptional genius of the jury system is that it collects and harmonizes the experiences of people from *every* walk of life, such that the removal of certain citizens from the pool of potential jurors jeopardizes the integrity of the jury's proceedings. The jury does not operate in the realm of cold logic, applying abstract reason to the lifeless maxims of the law. It does not, in short, perform a task that could be done just as well by one person as another. To the contrary, the jury makes decisions through its vital collective wisdom, bringing practical judgment accumulated through diverse experiences to bear on the messy realities of human life. Each perspective is unique, and so valuable that the systematic exclusion of any one may disrupt the balance that is vital for a fair and just verdict. As the great evidence scholar Dean John Henry Wigmore explained:

> Ask any twelve intelligent friends any question of opinion or fact, calling for serious thought. . . . Will it ever happen that you do not glean from at least two or three of the twelve some argument or detail or judgment that the others . . . had failed to mention?
> . . . .

---

[9] *Priestly v. Arizona*, 171 P. 137, 138 (Az. 1918).

[10] *See* Landsman & Holderman, *supra* note 5, at 34.

[T]he conduct of human life has to be based on elusive averages or generalities, whether in politics, law, medicine, engineering, commerce or ethics. And when it comes to applying these generalities to concrete cases, the only safe machinery, that is dependable in the long run, is a machinery that embodies an average judgment, i.e., the reconciliation of several judgments taken at random.[11]

All perspectives are vital for that task, so the court must be zealous to ensure the participation of people from all walks of life. Were the pressing needs of private business sufficient to excuse a prospective juror from service, the court would be left with a venire of only the unemployed and the retired. The resulting jury and its deliberations would be correspondingly impoverished to the extent that the jury would lack the unique insights of those citizens whose obligations preclude them from serving without inconvenience.[12]

The custodians of the jury process have recognized for centuries the need to include diverse perspectives on the jury. When in 1293, King Edward I of England became aware that the sheriffs of the realm were accepting bribes to excuse the rich from jury duty, he promulgated a statute to end the practice. 21 Edw. 1 (1293). Remarkably, the king recognized that the absence of the rich from the proceedings jeopardized the jury's effectiveness, and that as a result "great expences and trouble doth daily manifestly ensue, to the impoverishment and utter disheriting of many." *Id.* To be sure, the prejudices of the age restricted the privilege of serving on a jury to landed men, but already there was a sense that among that group, any systematic exclusion of a category of potential jurors would jeopardize the jury's essential function. In our age, now that the right to be a juror extends to all

---

[11] John H. Wigmore, *A Program for the Trial of Jury Trial*, 12 J. Am. Judicature Soc'y 166, 169-71 (1929).

[12] Prospective jurors with immovable and sufficiently weighty obligations can, of course, request that their jury service be rescheduled. There is no evidence that Enke made such a request in this case, despite his knowledge that his jury service might conflict with his business trip to Iowa.

citizens, regardless of race or gender, we should adhere all the more to this ancient principle.

But the exclusion of any type of citizen from jury service is significant for yet another reason, for it threatens the rationale at the heart of our democratic government. Government by the people assumes that the public at large is sovereign, and the jury is nothing less than a cross section of the public at large. That is why those who contend that the average citizen is not qualified to decide fundamental issues of justice[13] are necessarily arguing against the foundation of democratic government itself. Indeed, the jury is one of the purest embodiments of democracy in the modern age, in that it involves true deliberation by the people, and not merely the tabulation of votes. If the decisions of a jury should be given to experts, so too should all questions of government. An abdication of the right to serve on a jury is nothing less than an abdication of the right to self-government. In the face of such a threat it is vital that all citizens participate on juries, and not sell their birthright for a mess of pottage.

The words of Blackstone regarding the jury, though written in the eighteenth century, ring true still:

> It is therefore, upon the whole, a duty which every man owes to his country, his friends, his posterity, and himself, to maintain to the utmost of his power this valuable constitution in all its rights; to restore it to its ancient dignity, if at all impaired by the different value of property, or otherwise deviated from its first institution; to amend it, wherever it is defective; and, above all, to guard with the most jealous circumspection against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretenses, may in time imperceptibly

---

[13] *See, e.g.*, Oliver Wendell Holmes, *Law in Science and Science in Law*, 12 Harv. L. Rev. 443, 459 (1899) ("I confess that in my experience I have not found juries specially inspired for the discovery of truth. I have not noticed that they could see further into things or form a saner judgment than a sensible and well trained judge. I have not found them freer from prejudice than an ordinary judge would be." ).

undermine this best preservative of English liberty.[14]

II.     Analysis of Respondent Enke's Failure to Appear on March 8, 2012

Under 28 U.S.C. § 1866(g), the burden is on Enke "to show good cause for [his] noncompliance" with the jury summons and Judge Conlon's order that he return to court for his jury service when he failed to appear in court on March 8, 2012.[15] Section 1866 deals with court administration and does not appear in the federal criminal code set out in Title 18 of the United States Code.  Section 1866 is thus not a criminal statute, but it does provide quasi-criminal sanctions for jurors who fail to meet their burden to show cause for shirking their duty as a citizen to serve on a jury when called. Indeed, here Enke was not only called, but was actually selected and sworn to serve on a jury in a criminal case. Given the severity of the potential sanctions Enke faces for his conduct, the court has held, as it announced at the outset of the show cause hearing, that Enke's burden is to show good cause only by a preponderance of the evidence, not by some stricter burden of proof.

A.     Juror Enke

Enke has failed to meet that burden, because the court finds that there is no plausible reason for Enke's belief that he was excused from his jury service responsibilities on March 8. First, the jury summons he received plainly required his service for two weeks, and gave no indication that he might be excused earlier. Second, Enke was informed by Judge Conlon on the record during jury selection that the trial would last "approximately one week." Even assuming Enke heard comments

---

[14] 3 William Blackstone, *Commentaries* *381.

[15] *See In re Ahart*, No. MC 07-0078, 2007 WL 4626773, at *2 (N.D. Iowa Dec. 31, 2007); *In re Bear*, Misc. No. 07-56, 2007 WL 1731098, at *2 (S.D. Tex. June 14, 2007); *In re Stencavage*, No 05 MC 00009, 2005 WL 483388, at *1 (D.N.H. Mar. 2, 2005).

from his fellow jurors or some other source that the trial would last only three to five days, he should have relied on Judge Conlon's estimate. Accordingly, Enke should have known that the *Chhibber* trial for which he was selected as a juror was likely to last from Thursday, March 1, at least through the following Thursday, March 8.

Enke was therefore on notice that there was a good chance that he would not be able to make the trip to Iowa City, 223 miles away from Chicago, on March 8. Nonetheless, Enke never informed anyone at the court before the evening of March 7 of this scheduling conflict. Moreover, he never asked another sales representative to cover the Iowa trip, nor did he ever ask Bushok for assistance in finding coverage, although he could have done so. Instead, reviewing the evidence in Enke's favor, the court can only conclude that he indulged in wishful thinking that the *Chhibber* trial would be complete before March 8, and that he would be free to travel to Iowa.

That conclusion may help to explain the disagreement between Enke and Rone about their conversation on the evening of March 7. Based on the court's evaluation of the courtroom demeanor and credibility of the witnesses, the court finds it exceedingly implausible that Rone, an experienced United States district court deputy clerk, would unilaterally tell any juror that he or she was excused from further service during an ongoing jury trial without the approval of the judge presiding at the trial. At best, therefore, Enke's wishful thinking led him to mishear or misinterpret Rone's comments. At worst, Enke is lying. In either case, any belief on his part the evening of March 7 that he had been excused from further jury service in the *Chhibber* trial was unjustified and does not constitute good cause for his absence on March 8.

All that is left, therefore, is the urgency of the trip to Iowa. The court has no doubt that Enke sincerely believed that his presence in Iowa was important to his ongoing professional success. As

explained above, however, the jury system cannot survive if jurors are allowed to place their own private business interests above their public service once they are a sworn member of a jury. Enke, and other jurors in his position, must understand that at that point jury service comes first unless something beyond their control occurs in their lives and they are excused by the court. Enke's business trip, although perhaps urgent in his mind, was not good cause for violating the oath he took as a juror and intentionally failing to appear for jury service on March 8, 2012.

B.      Bob Bushok and Covidien

Section 1866(g) does not directly impose liability on the employer of an employee who fails to appear for jury service. The court need not decide today whether an employer may be liable under § 1866(g) under a legal theory that the employer induced an employee's absence from jury service. In this case, there is no evidence that Covidien or Bushok explicitly induced Enke's decision to abandon his responsibilities as a juror in the *Chhibber* trial.

Nonetheless, Covidien's behavior in this case is troubling, because Covidien failed to display the respect necessary from employers to support the American jury system. Covidien's Jury Duty Policy states that "[i]t is the policy of Covidien to support employees who are called to serve on jury duty." (Covidien Ex. A, at 3.) Covidien woefully failed to live up to that policy here. Bushok's conversations with Enke during the week of his jury service indicated that Enke was distressed about the upcoming conflict between his jury service and the Iowa trip. At no point, however, did his supervisor Bushok offer to help Enke find someone to replace him at the Iowa proceedings or offer any assistance to Enke of any kind in support of Enke fulfilling his responsibilities as a juror. The court suspects that Covidien and Bushok wanted to avoid any risk that the hospital and doctor in Iowa would be unhappy if Enke did not attend the scheduled procedures. Accordingly, they were

quietly hoping that the pressure Enke felt would force him to go to Iowa as he did, even if his doing so meant neglecting his obligations on the jury, and they thus declined to offer Enke assistance.

Companies doing business in America, like individuals in America, may avail themselves of the right to a trial by jury where constitutionally applicable. Consequently, companies doing business in America, like individuals in America, must also be willing to help provide the right to a jury trial to others, even if doing so means relieving an employee like Enke who is serving as a juror from having to engage in the company's business endeavors during the time of that employee's jury service. Covidien failed to live up to that responsibility here. The court hopes that the time and expense that Covidien has incurred to attend the show cause hearing will serve as a sufficient encouragement to other companies to take their responsibility to uphold the American jury system seriously.

CONCLUSION

For the reasons stated above, the court finds that Respondent Scott C. Enke, a sworn juror in a criminal trial, has failed to establish good cause for his absence from jury service in that trial on March 8, 2012. A sentencing hearing is set for June 12, 2012, at 2:00 p.m. Enke and his counsel are ordered to appear on that date.

ENTER:

_James F. Holderman_

_____
JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: May 23, 2012